**UNITED STATES of America**

**v.**

**Salvatore CASTELLANA, also known as Sam Castellana.**

**No. 72–327–Cr–T–H.**

United States District Court, M. D. Florida, Tampa Division.

May 2, 1973.

Harvey E. Schlesinger, Asst. U. S. Atty., Jacksonville, Fla., for the U. S.

Henry Gonzalez, Tampa, Fla., for defendant.

## OPINION AND ORDER

CHARLES R. SCOTT, District Judge.

This cause came on for hearing on defendant's motions to suppress evidence and to suppress statements of the accused. Defendant is charged with illegal possession of a firearm by a convicted felon, in violation of 18 U.S.C. App. § 1202(a).

The issue to be resolved is whether, without prefacing the question with *Mi-* *randa* warnings, federal officers may properly ask a suspect who is in custody for the purpose of being searched pursuant to a properly issued search warrant, but who is not under arrest, if he has any weapons within reach. In this case the issue is not the abstract propriety of the police conduct but the admissibility against defendant of the statements made by him in response to the agent's question and the admissibility against defendant of evidence uncovered by an illegal search and seizure.

After hearing the testimony, examining the documentary evidence and reviewing the applicable law, the Court finds that the statements should be suppressed as being gained by a means which was violative of defendant's privilege against self incrimination because they were elicited from him without the benefit of previous warnings as required by Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The Court further finds that the evidence which was seized should be suppressed as being the product of an unreasonable search and seizure in violation of the Fourth Amendment.

Agents of the Federal Bureau of Investigation obtained warrants to search the premises of the Albany Drive In Market in Tampa, Florida,[1] and to search the person of its proprietor Salvatore Castellana, the defendant herein.[2] The warrants were obtained in order to pursue an investigation for possible violations of the illegal gambling provisions of 18 U.S.C. § 1955, and specifically to search for gambling paraphernalia. Affidavits support both warrants with sufficient probable cause to justify the is-

---

1. The warrant to search the Albany Drive In Market described the property allegedly concealed therein as,

    Bookmaking records and wagering paraphernalia consisting of, but not limited to, betting records and tally sheets pertaining to wagers placed on dog races, lottery, (Bolita, Bond and numbers) bets, along with United States Currency, an adding machine, and contents of safe.

2. The warrant to search the person of Salvatore Castellana described the property allegedly concealed on his person as,

    Bookmaking records and wagering paraphernalia consisting of, but not limited to, betting records and tally sheets pertaining to wagers placed on dog races and lottery, (Bolita, Bond and Numbers) bets, along with United States Currency.

suance thereof.[3] The affidavits contain a statement that an "elderly Negro male" was employed by the defendant as a watchman, and that he often sat in the back of the store with a shotgun. Nevertheless, the warrant did not mention any weapons and the affidavit did not mention handguns.[4]

At 6:14 P.M., August 5, 1972, 20 armed agents of the Federal Bureau of Investigation dressed in casual street clothes arrived at the Albany Drive In Market in order to execute the search warrants.[5] After identifying themselves to the defendant and announcing their purpose, the lead agent, Special Agent Milarney, broke the locked glass door and entered the market. Milarney again announced the purpose of the raid to everyone in the store while Special Agent Smith requested that defendant, who was standing just inside the front door of the store, accompany him to the back room of the store, a distance of about 40 feet. Defendant stood about four feet from his desk in the back room while Smith prepared to read the warrant to him. This was interrupted when Special Agent Arwine walked up to the defendant and asked, "Do you have any weapons within reach?" The defendant replied, "Yes, down there", indicating the lower desk drawer. Upon opening the drawer the agent found four handguns. He then asked the defendant, "Where did you get them?" To which the defendant replied, "I took them in on a loan."

The gun upon which the present indictment for illegal possession of a firearm by a convicted felon was based was the only one of the four handguns found in the desk drawer which had traveled in interstate commerce. Thus, it was the only one upon which the instant federal charge could properly be based. The defendant does not challenge the fact that he was convicted of a felony by a court of the State of Florida.

When the agent opened the desk drawer the weapon in question was in a clear plastic evidence bag with notations thereon from a previous seizure by officers of the Florida Department of Law Enforcement. FBI agents testified they did not know of the earlier seizure by state officers before the raid of August 5, 1972.

After discovering the handguns, agent Smith read the search warrant to the defendant and advised him of his *Miranda* rights. The defendant refused to sign a waiver of rights form. Thereupon, the agents proceeded to search the defendant and the store and to inventory the items. Neither the defendant nor anyone else on the premises was then, or was at any time during the two hour raid, placed under arrest.

The four handguns were then unloaded and placed on the desk in front of the defendant, where they remained throughout the raid. Only the gun in question was in a plastic bag.

The government contends that agents while executing a warrant to search the person of a suspect have the right and duty, for their own protection, to inquire of the suspect whether he has any weapons within his reach, before they proceed to give him *Miranda* warnings.

The defendant contends that the Fourth, Fifth and Sixth Amendments to the United States Constitution and the exclusionary rules enunciated in Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), Miran-

3. In addition, the agents had warrants to search the person of four employees of the Albany Drive In Market.

4. One agent testified that the failure to mention the shotgun in the search warrant was due to neglect and oversight in its preparation. But there was no evidence of any probable cause to believe that the weapon had been carried in interstate commerce. Thus, there would have been no justification to search for or seize the shotgun.

5. Two undercover FBI agents had already entered the store, were in the back room and had announced who they were before the main force arrived and entered the store.

da v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and their progeny prohibit the introduction in evidence of any items discovered as a result of a custodial interrogation before *Miranda* warnings are given.

This Court does not now and never has advocated any construction of the Constitution which would unnecessarily place the life or safety of a law enforcement officer in danger. But in this case there is ample evidence, not only that there was no actual threat of physical harm to the agents from the defendant, but also that they did not believe there was any potential threat to their safety or well-being from the defendant. Special Agent Smith, who escorted the defendant to the back room, testified that he did not pat down the defendant for weapons before moving to the back room because he did not feel that the defendant posed any physical threat to him. Neither did he pat down the defendant immediately upon reaching the back room.

The agents could not have believed that the defendant posed a physical threat to them after the weapons were discovered or they would not have placed them on the desk in front of him. No evidence was introduced at the hearing on the motions to suppress which would indicate any reason to believe that the defendant posed any physical threat to the agents' safety.

The Court is not presented with the question of whether, when the suspect is under arrest, the agents would be entitled to make an inquiry regarding the proximity of weapons before *Miranda* warnings are given, but is presented only with the question whether such inquiry may properly be made of a suspect in custody pursuant to the execution of a warrant to search his person.

No arrest warrant was outstanding against the defendant and no arrest was made of the defendant at the time of the search. Thus, the doctrine of Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), is inapplicable. In Chimel the Supreme Court held that,

> *When an arrest is made,* it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape. . . . And the area into which an *arrestee* might reach in order to grab a weapon or evidentiary items must, of course, be governed by a like rule. A gun on a table or in a drawer in front of *one who is arrested* can be as dangerous to the arresting officer as one concealed in the clothing of the person arrested. (emphasis supplied)

395 U.S. 752 at 763, 89 S.Ct. at 2040.

The Supreme Court makes it clear in *Chimel* that before the officer may search the area "within the immediate control" of the suspect an arrest must have been made. Thus, the *Chimel* search procedure is a search incident to a lawful arrest, and was not intended to be used as a search incident to the execution of a warrant to search the person of a suspect.

Furthermore, the *Chimel* rule permitting an "area search" by the arresting officer cannot properly be expanded, and should not properly be abused, by permitting the officer to move the arrestee from room to room in order to conduct an "area search" in each room to discover any weapons or evidence which might come into his reach. In this case the agents moved the defendant a distance of approximately 40 feet from the main portion of the store into the back room, and nearer to the subject handguns, before asking him about weapons, and before discovering them in the desk.

Thus, although *Chimel* cannot apply to the facts of this case because the defendant was not under arrest, even if *Chimel* were applicable the area search which it mandates was abused by moving the defendant into the back room before conducting the "area search".

This is not a case where the agents can be charged with conducting a "bad faith exploratory search" beyond the scope of the search warrant.[6]

The government relies upon the cases of Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and Adams, Warden v. Williams, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972), in support of the claim that the guns should not be suppressed. The *Adams* case can readily be distinguished from the case at bar because the search in that case was incident to a lawful arrest, while here there was no arrest.

*Terry* stands for the proposition that, when an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, he may take all reasonably necessary steps to neutralize the threat of physical harm. Here, however, unlike *Terry*, the agents were not investigating suspicious behavior of a person stopped on the streets, but were executing a search warrant in a store upon a man who agents testified posed no threat of physical harm to them. There was no evidence introduced at the hearing on the motions to suppress which indicates any reason to believe that the defendant posed any physical threat to the agents' safety.

■ Although the defendant was not under arrest, there can be no doubt that he was "in custody" and could not leave. He certainly could not leave until after the agents had executed the warrant to search his person. Agent Arwine's questions, "Do you have any weapons within reach?" and "Where did you get them?", certainly constitute a "custodial interrogation" as that phrase was defined by the Supreme Court in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. . . . Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.

384 U.S. 436 at 444, 86 S.Ct. at 1612.

The fact that the defendant could not leave until the search warrant was executed makes this situation "custodial". The questions propounded to him were undoubtedly an "interrogation", and it is undisputed that he was not advised of his *Miranda* rights until a later time. Thus, the Court finds that agent Arwine's questions constituted a "custodial interrogation", as that term is defined in Miranda v. Arizona, *supra*, and, therefore, the defendant was entitled to the full range of *Miranda* warnings before the commencement of such questioning.

■ The fact that agents possessed warrants authorizing a search of the premises and of the defendant does not act to make the *Miranda* exclusionary rule inapplicable in this case. Here the interrogation began before the agents began to execute the warrant to search the premises, and even before the defendant was patted down. A search warrant does not authorize the officers to conduct a custodial interrogation without the benefit of first giving the defendant *Miranda* warnings.

■ It cannot be successfully argued that the defendant "voluntarily, knowingly and intelligently" waived these rights by answering agent Arwine's questions.[7] The government has

6. In United States v. Tranquillo, 330 F.Supp. 871 (M.D.Fla.1971), the Court found that the search conducted by federal officers was "inconsistent with the lawful purpose of executing a warrant to search for stolen cloth-

ing, but rather such acts constituted an exploratory search in violation of the defendant's rights under the Constitution."

7. Thus, this case is clearly distinguishable from the recent decision of the Court of Ap-

a heavy burden of demonstrating that the defendant knowingly and intelligently waived his constitutional rights before the questioning commenced. *Miranda v. Arizona, supra;* Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938). The government has not met this heavy burden in this case. Courts must indulge in every reasonable presumption against a waiver of fundamental constitutional rights. Johnson v. Zerbst, *supra;* Fitzgerald v. Wainwright, 440 F.2d 1049 (5th Cir. 1971); Baker v. Wainwright, 422 F.2d 145 (5th Cir. 1970).

■ Therefore, the statements by defendant which directed the officers to the concealed firearms must be suppressed because they were the product of a custodial interrogation in violation of *Miranda.* Because of the sequence of events and the timing of the agents in this case, the motion to suppress the weapons must also be granted. Before agent Smith began to read the search warrant to the defendant, agent Arwine began to interrogate him and to search the premises. The guns were discovered during an illegal search which preceded the search which would be justified in executing the search warrant.

The agents did not begin to execute the warrant to search the person of defendant or to search his store until after the incriminating questions were asked by agent Arwine and until after the guns were found. Thus, the search was in violation of the Fourth Amendment prohibition of unreasonable searches and seizures, and the guns were illegally seized. The *Wong Sun* exclusionary rule applies to bar from trial the physical, tangible materials obtained during or as a direct result of an unlawful invasion. 371 U.S. 471, 485, 83 S.Ct. 407 (1963). The discovery of the guns was the "fruit" of an illegal search and they must, therefore, be excluded from admission in evidence at trial. Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); Silverthorne

Lumber Co. v. United States, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920).

Thus, the Court is constrained to suppress the guns from evidence at trial because they were the "fruit" of an illegal search and seizure in violation of the Fourth Amendment.

peals for the Fifth Circuit in United States v. Vasquez, 476 F.2d 730 (5th Cir. 1973). In *Vasquez* the defendant executed a waiver of rights form before he made the challenged statements.