Richard Lee MARKHAM, Plaintiff,

v.

UNITED STATES DEPARTMENT OF the TREASURY, BUREAU OF ALCOHOL, TOBACCO AND FIREARMS, Defendant.

Civ. A. No. 82–73219.

United States District Court, E.D. Michigan, S.D.

June 9, 1983.

**10**

Francis J. Hearsch, Jr., Robert J. Seibert, Mount Clemens, Mich., for plaintiff.

Ellen E. Christensen, Asst. U.S. Atty., Detroit, Mich., for defendant.

## OPINION

RALPH B. GUY, Jr., District Judge.

■ This matter is before the court on cross-motions for summary judgment. As framed by the parties, the sole issue before the court is whether a convicted felon who has been pardoned by the chief executive of a state and has been expressly authorized by the chief executive to receive, possess, or transport in commerce a firearm, is subject to prosecution under a federal statute that provides: "It shall be unlawful for any person ... who has been convicted in any court, of a crime punishable by imprisonment for a term exceeding one year ... to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce." 18 U.S.C. § 922(h). For the reasons stated below, the court concludes that a convicted felon who receives a firearm which has been shipped in interstate commerce may be prosecuted under § 922(h) even though he has been pardoned by the chief executive of a state and has been expressly authorized to possess a firearm by that official.

Because of a growing concern with the increasing level of violent crimes and civil disobedience, Congress enacted the Omnibus Crime Control and Safe Streets Act of 1968. Pub.L. 90–351, 82 Stat. 197 (1968), U.S.Code Cong. & Admin.News at 237. Title IV of that Act contained restrictions on the sale and receipt of firearms that had traveled in interstate commerce and was intended as an aid to keep firearms out of the hands of those not legally entitled to possess them because of age, criminal background, or incompetency. *Id.* at 2113. Although the primary thrust of that title was to regulate the activities of interstate firearms' dealers, § 922(e) provided that "[i]t shall be unlawful for any person who is under indictment or who has been convicted in any court of a crime punishable by imprisonment for a term exceeding one year, or who is a fugitive from justice, to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce." Recognizing the need for relief to certain felons who might be unjustly handicapped by this provision, the Act further provided that the Secretary of Treasury, except where the felon had been convicted of a crime involv-

ing a firearm, may remove the § 922(e) disabilities upon his determination that the applicant was not likely to engage in further criminal activity and that the granting of relief would not be contrary to the public interest. *Id.* § 925(c). As noted by the Supreme Court in *United States v. Batchelder*, 442 U.S. 114, 120, 99 S.Ct. 2198, 2202, 60 L.Ed.2d 755 (1979), "Title IV of the Omnibus Act merely recodified with some modification [a] carefully constructed package of gun control legislation which had been in existence for many years." *Accord., Scarborough v. United States*, 431 U.S. 563, 570, 97 S.Ct. 1963, 1966, 52 L.Ed.2d 582 (1977).

During the debates on the Omnibus Act, the nation was shocked by the assassination of Dr. Martin Luther King. In response to that and other politically and racially motivated acts of violence, Senator Long of Louisiana proposed that additional restrictions be placed on the receipt, possession, and transportation of firearms by designated classes of persons. *See Stevens v. United States*, 440 F.2d 144, Appendix A at 152–158 (6th Cir.1971). As a result, Title VII was added to the Act. Although Title VII was a last minute floor amendment, "hastily passed, with little discussion, no hearings, and no report," which overlaps Title IV in certain respects, *United States v. Batchelder, supra; Scarborough v. United States, supra*, a review of the Congressional Record indicates that it was intended to expand the restrictions contained in Title IV in two respects. First, the disability against receiving and transporting firearms was extended to five classes of individuals including (1) persons convicted of a felony, (2) persons who have been discharged from the armed forces with other than an honorable discharge, (3) persons who had been adjudged to be mentally incompetent, (4) persons who had renounced their United States citizenship, and (5) persons who were illegal aliens. *See* 440 F.2d at 155. Second, the restrictions were intended to extend to the mere possession of firearms to the extent compatible with the powers of Congress to regulate intrastate matters affecting com-

merce. *See* 440 F.2d at 155–56. As with Title IV, exceptions to the disabilities imposed by Title VII were included in the legislation ultimately adopted. Specifically, § 1203(2) provided that "[t]his title shall not apply to any person who had been pardoned by the President of the United States or the chief executive of a State and has expressly been authorized by the President or such chief executive, as the case may be, to receive, possess, or transport in commerce a firearm."

Later that year, Congress passed the Gun Control Act of 1968. Pub.L. 90–618, 82 Stat. 1213 (1968), U.S.Code Cong. & Admin.News at 1397. The purpose of that Act was to amend the Omnibus Act to provide better control of the interstate traffic in firearms. *Id.* Both Title IV and Title VII were affected by this subsequent legislation. For example, the Title IV restriction on the receipt of firearms which had traveled in interstate commerce was extended to users of certain drugs and persons who had been adjudicated as a mental defective. *See* 18 U.S.C. § 922(h). *Id.* at 4429–30. In addition, the authority of the Secretary of Treasury to grant exemptions under Title IV was extended to restrictions imposed by any Federal law. 18 U.S.C. § 925(c). The primary change to Title VII was to limit the scope of the disabilities imposed on veterans. Of particular relevance to the issue now under consideration, however, is the fact that Congress did not extend the Title VII exemptions to any other Federal law.

Against this statutory background, the court will next set forth the relevant facts of the present controversy. In 1961, plaintiff was convicted of armed robbery. Nineteen years later, the Governor of the State of Nebraska, together with the Secretary of State and Attorney General of that State, granted plaintiff an unconditional pardon which expressly allowed plaintiff to possess a firearm. The government concedes that the relevant pardon complies with the requirements of § 1203(2) and that plaintiff is not subject to the Title VII restriction on possession of a firearm. De-

spite the 1980 pardon, however, the Department of Treasury informed plaintiff on May 19, 1981, that the federal firearm disabilities imposed by § 922 of Title IV continued to exist. As a result, plaintiff instituted the present declaratory judgment action to determine the legal effect of the 1980 pardon.

Because no factual disputes existed, the parties agreed to present the within matter for resolution on cross-motions for summary judgment. In his motion, plaintiff relied on two arguments. First, plaintiff argued that the Secretary of Treasury was required to give full faith and credit to the Governor's determination that plaintiff should be allowed to carry a firearm. Second, plaintiff contended that the rule of lenity required a determination that a qualified pardon also removes Title IV firearm disabilities, as a contrary construction would render § 1203(2) a nullity. In its motion, the government responded that a determination of the effect to be accorded a governor's pardon relative to federal firearm legislation was a matter of federal and not state law. Moreover, the government contended that the rule of lenity had no application as Title IV was not ambiguous and therefore should be literally construed. Both parties conceded that the courts have split on the question of the effect to be given a governor's pardon relative to the Title IV disabilities. *Compare United States v. Matassini*, 565 F.2d 1297 (5th Cir.1978) (holding that a felon could not be convicted under § 922(h) where he had received a qualified pardon under § 1203(2)), with *Thrall v. Wolfe*, 503 F.2d 313 (7th Cir.1974), *cert. denied*, 420 U.S. 972, 95 S.Ct. 1392, 43 L.Ed.2d 652 (1975) (holding that a felon could be convicted under § 922(h) despite a qualified pardon under § 1203(2)).

■ Subsequent to the filing of the aforementioned motions, the matter was referred to Magistrate Steven W. Rhodes for a report and recommendation. On April 21, 1983, the magistrate entered his report and recommendation that summary judgment should be entered in favor of the defendant. As to the full faith and credit argument, the magistrate found that the recent Supreme Court decision in *Dickerson v. New Banner Institute, Inc.*, 460 U.S. 103, 103 S.Ct. 986, 74 L.Ed.2d 845 (1983) was controlling. In *Dickerson*, the Court held that a person stood convicted of a felony under § 922(h) despite the subsequent expungement of that conviction under Iowa law. In reaching that conclusion, the Court stated that the question of whether a person had been convicted for purposes of the federal firearm statutes was a matter of federal law that should not depend upon the vagaries of state criminal expunction provisions. In light of this pronouncement, the magistrate rejected plaintiff's argument that he was not a person who stood convicted under § 922(h) because of his pardon by the Governor of Nebraska. Given that neither party has filed timely objections to this portion of the report and recommendation, the court accepts the magistrate's determination that the Secretary is not bound by the Governor's pardon pursuant to 28 U.S.C. § 1738. *See* 28 U.S.C. § 636(C). Even if objections had been filed, the court would have accepted the magistrate's recommendation in light of the absence of any case authority in support of the plaintiff's position. *See, e.g., Thrall v. Wolfe, supra* (rejecting full faith and credit argument).

As to the statutory construction argument, the magistrate concluded that the rule of lenity had no application because Title IV was not ambiguous. Although he recognized that the Supreme Court has applied the rule of lenity to Title VII where the relevant provision is ambiguous on its face, *see United States v. Bass*, 404 U.S. 336, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971), the magistrate also noted that the Supreme Court has refused to apply that rule where the ambiguity arises from an apparent inconsistency between Title IV and Title VII. *See United States v. Batchelder*, 442 U.S. 114, 99 S.Ct. 2198, 60 L.Ed.2d 755 (1979). Specifically, the Court in *Batchelder* refused to limit the maximum sentence under § 922(h) to that provided by § 1202(a). *Id. See also United States v. Green*, 515

F.Supp. 517, 522 n. 8 (D.Md.1981). Given that Title IV provides an unambiguous method for seeking exemption, the magistrate similarly refused to incorporate the § 1203(2) exemption into Title VII. In objecting to this determination, plaintiff contends that the magistrate overlooked the Supreme court's recent admonition to treat Titles VII and IV *in pari materia.* *See Dickerson v. New Banner Institute, Inc., supra,* 103 S.Ct. at 994. In short, plaintiff contends that the rule of lenity requires the incorporation of § 1203(2) into Title IV to avoid the anomoly of having different means of attaining exemption for the same crime.

■ A review of the Magistrate's Report and Recommendation, as well as plaintiff's objections thereto, convinces the court that the magistrate correctly refused to apply the rule of lenity for several reasons. First, the court agrees with the magistrate's determination that the rule of lenity has no applicability, as Title IV is unambiguous on its face. *See United States v. Batchelder, supra; Scarborough v. United States,* 431 U.S. 563, 97 S.Ct. 1963, 52 L.Ed.2d 582 (1977). The Supreme Court's recognition in *Dickerson* that the two titles have been construed *in pari materia* does not alter that conclusion. A review of the relevant sentence indicates that the Supreme Court's comments were limited to a discussion of the definition of a convicted person under the two titles. *Dickerson v. New Banner Institute, Inc., supra,* 103 S.Ct. at 994. *See Lewis v. United States,* 445 U.S. 55, 100 S.Ct. 915, 63 L.Ed.2d 198 (1980). When comparing the means of attaining an exemption under the two titles, however, the Court noted:

Title VII, which we construed in *Lewis,* explicitly provides that pardons granted by the President of the United States or a state governor, specifying that the recipient is authorized to receive, possess, or transport firearms, lift the disabilities imposed by that title. 18 U.S.C.App. § 1203(2). Except § 925(c), permitting the Secretary to remove the disabilities in specified circumstances, there is no

comparable provision in Title IV. By regulation, the Secretary has given presidential pardons, but not gubernatorial pardons, automatic enabling effect under Title IV. 27 CFR § 178.142 (1982).

*Dickerson v. New Banner Institute, Inc., supra,* 103 S.Ct. at 992 n. 10.

Second, the court finds that the legislative history supports the magistrate's determination. On one hand, Title IV was simply a recodification of a carefully constructed package of federal gun control legislation which had existed for many years. Because much of the legislation had been enacted prior to the Supreme Court's determination that the commerce clause allowed the federal court to regulate certain intrastate transactions, the scope of Title IV was limited to the regulation of interstate transactions in firearms or to the receipt and transportation of firearms that had traveled in interstate commerce. *See Barrett v. United States,* 423 U.S. 212, 96 S.Ct. 498, 46 L.Ed.2d 450 (1976). Given the narrow scope of this legislation, it is not surprising that Congress granted authority to the Secretary of Treasury, rather than the governors of the fifty States, to allow certain felons to participate in this narrow range of activities. As noted by the Court in *Dickerson,* albeit in a slightly different context:

Although we have searched diligently, we have found nothing in the legislative history of Title IV or related federal firearms statutes that suggests, even remotely, that a state expunction was intended automatically to remove the disabilities imposed by §§ 922(g)(1) and (h)(1). See, *e.g.,* S.Rep. No. 1501, 90th Cong., 2nd Sess. (1968); S.Rep. No. 1097, 90th Cong., 2nd Sess. (1968), U.S.Code Cong. & Admin.News 1968, at 2112; H.R.Rep. No. 1577 90th Cong., 2nd Sess. (1968), U.S.Code Cong. & Admin.News 1968, p. 4110; H.R.Conf.Rep. No. 1956, 90th Cong., 2nd Sess. (1968); H.R.Rep. No. 488, 90th Cong., 2nd Sess. (1968). This lack of evidence is significant for several reasons. First, the purpose of the statute would be frustrated by a ruling that

gave effect to state expunctions; a state expunction typically does not focus upon the question with which Title IV is concerned, namely, whether the convicted person is fit to engage in the firearms business or to possess a firearm. Second, " 'in the absence of a plain indication to the contrary, ... it is to be assumed when Congress enacts a statute that it does not intend to make its application dependent on state law.' " *NLRB v. Natural Gas Utility Dist.*, 402 U.S. 600, 603 [91 S.Ct. 1746, 1748, 29 L.Ed.2d 206] (1971), quoting *NLRB v. Randolph Electric Membership Corp.*, 343 F.2d 60 (4th Cir.1965). This is because the application of federal legislation is nationwide and at times the federal program would be impaired if state law were to control. *Jerome v. United States*, 318 U.S. 101, 104 [63 S.Ct. 483, 485, 87 L.Ed. 640] (1943). The legislative history reveals that Congress believed a uniform national program was necessary to assist in curbing the illegal use of firearms. See S.Rep. No. 1097, 90th Cong., 2nd Sess., 28, 76–77 (1968). Third, Title IV "is a carefully constructed package of gun control legislation .... 'Congress knew the significance and meaning of the language it employed.' " *Scarborough v. United States*, 431 U.S. 563, 570 [97 S.Ct. 1963, 1966, 52 L.Ed.2d 582] (1977), quoting *Barrett v. United States*, 423 U.S. at 217. And Congress carefully crafted a procedure for removing those disabilities in appropriate cases. § 925(c).

103 S.Ct. at 995.

On the other hand, Title VII was a last minute floor amendment which was intended to apply to the mere possession of a firearm, regardless of whether the weapon had ever been shipped in interstate commerce. *Scarborough v. United States, supra*, 431 U.S. at 575, 97 S.Ct. 1963. Although the rule of lenity was subsequently applied to limit the scope of the statute to the possession of a firearm that had traveled in interstate commerce, see *United States v. Bass*, 404 U.S. 336, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971), this initial purpose, i.e., to prohibit a felon from possessing a firearm manufactured in his home state, explains why Congress would give the power of exemption to state executives in addition to the President. When consideration is given to the fact that Congress subsequently amended § 925(c) to allow the Secretary to exempt a felon from firearm disabilities imposed by all federal statutes but failed to similarly extend the authority of state executives under § 1203(2), the court concludes that Congress intended to limit the scope of § 1203(2) to the disabilities imposed by Title VII.

Third, the court finds the reasoning of the court in *Martinez v. G.R. Dickerson*, No. 79–869 (D.N.M.1980), as applied to the facts of this case, to be compelling. As noted above, plaintiff was convicted of armed robbery. Under § 925(c), Congress did not give the Secretary authority to waive firearm disabilities where a felon had been convicted of a crime involving a firearm. In following that line of cases which refused to incorporate § 1203(2) into Title IV, the court, in *Martinez*, reasoned:

In *Thrall v. Wolfe*, 503 F.2d 313 (7th Cir.1974), the Court held that §§ 922 and 925 applied to a felon convicted of an offense involving the use of a firearm, punishable by more than a year's imprisonment. The Court so held notwithstanding the plaintiff had been previously pardoned by the state governor with specific authorization to receive, possess, and import or transport in commerce a firearm. The Court reasoned, "If a state pardon were an alternative to relief under § 925(c), the exception for crimes involving a firearm would have little vitality." *Id.* at 316.

Plaintiff's complaint alleges facts similar in all material respects to those in *Thrall, supra*. Accordingly, the court holds that the disabilities of § 922(g) and (h) apply to plaintiff. The Court is aware of contrary authority holding that a governor's pardon under 18 U.S.C.App. § 1203 suffices to remove the disabilities of § 922. *United States v. Matassini*, 565 F.2d 1297 (5th Cir.1978); *see also United States v. Dameron*, 460 F.2d 294

15

(5th Cir.1972); *United States v. One Lot 18 Firearms*, 325 F.Supp. 1326 (D.N.H. 1971). But these cases did not involve a felony involving the use of a firearm, a distinction which this Court concludes was correctly analyzed in *Thrall, supra. See* 44 A.L.R.Fed. 692; *Cf., Lewis v. United States*, [445] U.S. [55, p. 65, 100 S.Ct. 915 p. 921, 63 L.Ed.2d 198] Slip Op. p. 9 (2–27–80).

Given that the court finds nothing in the legislative history or the relevant case authority which would justify this court in refusing to give effect to the congressional determination that a person who is convicted of a felony involving a firearm should not be allowed to carry a firearm, the court concludes that summary judgment in favor of the defendant must be granted.